JONATHAN COHEN
DC Bar No. 483454; jcohen2@ftc.gov
MIRIAM R. LEDERER
DC Bar No. 983730; mlederer@ftc.gov
600 Pennsylvania Ave., NW, CC-9528
Washington, D.C. 20580
202-326-2551 (Cohen); -2975 (Lederer); -3197 (fax)

JOHN D. JACOBS (Local Counsel)
CA Bar No. 134154, jjacobs@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
310-824-4343; -4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

**FILED**
APR 14, 2015
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY MKU
Deputy Clerk, U.S. District Court

**UNDER SEAL**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

　　　　　Plaintiff,

　　v.

DENNY LAKE (also d/b/a JD United, U.S. Crush, Advocacy Department, Advocacy Division, Advocacy Program, and Advocacy Agency); CHAD CALDARONELLO (a/k/a Chad Carlson and Chad Johnson), individually and as an officer of C.C. Enterprises, Inc.; C.C. ENTERPRISES, INC. (also d/b/a HOPE Services, Trust Payment Center, and Retention Divisions); DEREK NELSON (a/k/a Dereck Wilson), individually and as an officer of D.N. Marketing, Inc.; D.N. MARKETING, INC. (also d/b/a HAMP Services and Trial Payment Processing); BRIAN PACIOS (a/k/a Brian Barry and Brian Kelly); JUSTIN MOREIRA (a/k/a Justin Mason, Justin King, and Justin Smith),

　　　　　Defendants, and

CORTNEY GONSALVES,

　　　　　Relief Defendant.

Case No. SACV 15-00585-CJC (JPRx)

RULE 65(b)(1) CERTIFICATION OF JONATHAN COHEN IN SUPPORT OF *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

[LODGED UNDER SEAL]

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

(1) I am counsel for Plaintiff Federal Trade Commission ("FTC") in the above-captioned action, and I have personal knowledge of the matters contained herein. I submit this certification pursuant to Fed. R. Civ. P. 65(b)(1) in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order ("TRO"), Asset Freeze, the Appointment of a Temporary Receiver, and Related Relief ("*Ex Parte* Motion").

(2) In accordance with Fed. R. Civ. P. 65(b)(1)(A)-(B), I certify that the FTC has not provided notice to Defendants[1] regarding the *Ex Parte* Motion because, as explained herein and in the FTC's supporting Memorandum, providing Defendants with notice would defeat the purpose of the *Ex Parte* Motion and cause consumers to suffer immediate and irreparable harm.

(3) The specific facts supporting the FTC's *Ex Parte* Motion demonstrate (i) that the FTC is likely to prevail against Defendants and (ii) the balance of the equities supports the requested relief.

(4) As the accompanying Memorandum describes more fully, the HOPE Defendants purport to help distressed homeowners obtain loan modifications

---

[1] I refer to Denny Lake (also d/b/a JD United, U.S. Crush, Advocacy Department, Advocacy Division, Advocacy Program, and Advocacy Agency); Chad Caldaronello (a/k/a Chad Carlson and Chad Johnson), individually and as an officer of C.C. Enterprises, Inc.; C.C. Enterprises, Inc. (also d/b/a HOPE Services, Trust Payment Center, and Retention Divisions); Derek Nelson (a/k/a Dereck Wilson), individually and as an officer of D.N. Marketing, Inc.; D.N. Marketing, Inc. (also d/b/a HAMP Services and Trial Payment Processing); Brian Pacios (a/k/a Brian Barry and Brian Kelly); Justin Moreira (a/k/a Justin Mason, Justin King, and Justin Smith), and Cortney Gonsalves collectively as "Defendants." I refer to all defendants other than Lake and Gonsalves as "the HOPE Defendants."

through government agencies. Specifically, after a *faux* "underwriting" process, the HOPE Defendants report to homeowners that they are approved for a loan modification if they make three monthly trial mortgage payments (often along with a "reinstatement fee") into their lender's trust account.

(5) The FTC is likely to prevail against the HOPE Defendants because the evidence establishes that the HOPE Defendants steal these payments:

   i. The FTC conducted a substantial undercover investigation in which an FTC investigator posed as the wife of a distressed homeowner facing foreclosure. The undercover investigation shows that the HOPE Defendants marketed loan modification services to an apparent homeowner, promised a modification, and cashed the homeowner's payment—notwithstanding the fact that the homeowner does not exist, the loan is fake, the mortgaged property is an empty field, and the financial documents the homeowner sent as part of the "underwriting" process are all fabrications. Thus, the undercover investigation establishes that the HOPE Defendants collect money ostensibly for loan modifications, but they do not provide loan modifications. Put more bluntly, the undercover investigation establishes that the HOPE Defendants steal homeowners' payments.

   ii. Sworn testimony from homeowners and their lenders establishes that the homeowners sent trial mortgage payments to the HOPE Defendants, but their lenders never received these payments.

   iii. A forensic accounting establishes that the HOPE Defendants received approximately $1.9 million in homeowners payments, but they did not transfer this money to lenders.

   iv. The HOPE Defendants purport to obtain modifications through three alleged government "agencies"—Making Home Affordable ("MHA"), the Department of Housing and Urban Development ("HUD"), and the Neighborhood

Assistance Corporation ("NACA"). However, sworn testimony from the United States Treasury Department, HUD, and NACA establishes, among other things:

 (a) MHA is a website, not a government agency;

 (b) NACA is not a government agency;

 (c) Treasury, HUD and NACA do not routinely receive loan modification applications from third parties such as the HOPE Defendants; and

 (d) That Treasury, HUD and NACA each disavow any relationship with the HOPE Defendants.

(6) Furthermore, the balance of equities supports the requested relief for two reasons:

 i. Because most victims lose one or more entire mortgage payments, their interest in redress is extremely substantial. Additionally:

  (a) Threatened foreclosure affects others who reside in the home (such as children), not merely the mortgagor.

  (b) Victims are already in severe financial distress, and few easily recover. Some have lost their homes, and some have declared bankruptcy.

  (c) Even victims who retain their homes suffer both out-of-pocket losses as well as penalties, interest and credit damage associated with their missed payments.

 ii. The likelihood that the HOPE Defendants will dissipate or conceal assets is extremely substantial, whereas the likelihood that the HOPE Defendants would comply with an order to preserve assets and evidence is effectively zero.

  (a) Defendant Pacios exerts control over the HOPE Defendants' operation ("HOPE Services"), and he is already violating a Court order banning him from the loan modification industry.

    (b)    Fraud permeates HOPE Services. The HOPE Services scam is theft, not a technical regulatory violation.

    (c)    HOPE Services ignored a lawful discovery request from a regulatory agency (the Washington Department of Financial Institutions ("DFI")) concerning the conduct at issue here.

    (d)    Using aliases, different locations, Fictitious Business Names ("FBNs"), maildrops, and other techniques, the HOPE Defendants go to great lengths to hide themselves.

    (e)    The HOPE Defendants are already dissipating assets through large cash withdrawals and personal expenditures.

(7)    As the accompanying Memorandum describes more fully, while doing business under multiple names, Defendant Lake substantially assists the HOPE Services' fraud. The FTC is likely to prevail against Lake because (i) Lake knows (or is consciously indifferent) that HOPE Services violates the Mortgage Assistance Relief Services ("MARS") Rule's advance fee ban, and (2) Lake provides HOPE Services with substantial assistance. See 12 C.F.R. § 1015.6.

(8)    Lake knows (or is consciously indifferent) that HOPE Services violates the MARS Rule's advance fee ban because he knows (or is consciously indifferent) that HOPE Services receives payments from homeowners who do not have a written loan modification agreement with their lender. See 12 C.F.R. §1015.5(a).

(9)    The fact that Lake knows (or is consciously indifferent) that HOPE Services receives payments is apparent because:

    i.    Lake and his employees communicate with homeowners about their payments;

     ii.     Copies of one victim's payments were attached to a complaint that Lake answered; and

     iii.    HOPE Services pays Lake, and even if one assumes that Lake believes HOPE Services is paying him to prove homeowners with amorphous "advocacy" services they marketed to homeowners, Lake still knows (or is consciously indifferent) that homeowners have made payments for loan modification assistance.

(10)   The fact that Lake knows (or is consciously indifferent) that the homeowners HOPE Services refers to him do not have written modification agreements with their lenders is apparent because:

     i.      Lake's "advocacy services" ostensibly aim to help homeowners obtain or finalize modifications;

     ii.     Homeowners' have informed Lake that they do not have modifications, and Lake has given those homeowners advice that reflects his understanding that they do not have modifications; and

     iii.    Lake and his employees communicate with victims' lenders, and any material degree of communications with victims' lenders would disclose that HOPE Services' victims do not have loan modifications.

(11)   Although Lake knows (or is consciously indifferent) that HOPE Services violates the advance fee ban, he provides HOPE Services with substantial assistance. Most important, this assistance includes managing lender communications, thereby making it substantially more likely that victims will make additional payments that HOPE Services can steal. If homeowners communicate with their lenders directly, they would be very likely to learn that

6

their lender has not received their trial payments (and has no relationship with HOPE Services). However, by interposing himself between homeowners and their lenders, Lake filters information that would expose Hope Services' fraud. Despite reviewing dozens of complaints and speaking directly with more than thirty victims, the FTC could not identify any instance in which Lake or his entity disclosed to a homeowner than his lender had not received his trial payments.

(12) Additionally, Lake provides further support by helping "explain away" signs that HOPE Services is a fraud, and by reassuring homeowners that the loan modification process is moving forward.

(13) The balance of equities supports the relief requested against Lake. As explained above, victims' interest in redress is great. Additionally, the likelihood that Lake will dissipate or conceal assets is extremely substantial, whereas the likelihood that he will comply with an order to preserve assets and evidence is negligible:

    i.    Fraud permeates Lake's business because he knows HOPE Services injures victims, but he enables further injury rather than disclosing information that would allow consumers to protect themselves.[2]

    ii.    Lake has made at least two sworn false statements with respect to his activities, including:

        (a)    At least one misrepresentation in a sworn response to a DFI subpoena investigating Lake's loan modification activities;

---

[2] Fraud by omission is still fraud. *See, e.g., Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013) (identifying elements of fraud by omission claim under California law).

7

        (b)    At least one misrepresentation in a state-mandated FBN form, which obscures Lake's role with respect to his loan modification activities.

    iii.    Lake refused to comply with two DFI subpoenas investigating this loan modification activity.

    iv.    Lake obscures his role by operating through an unregistered FBN. None of Lake's "clients" deals with a legal entity associated with Lake.

(14) As the accompanying Memorandum describes more fully, Pacios owes the FTC (and victims from an earlier mortgage relief scam) approximately $1.19 million (plus interest).[3] However, to hide his income, instead of paying Pacios directly, HOPE Services pays Pacios' wife (or girlfriend), Relief Defendant Gonsalves.

(15) The FTC is likely to prevail against Relief Defendant Gonsalves because (i) Gonsalves received ill-gotten funds from HOPE Services and (ii) does not have a legitimate claim to those funds. HOPE Services pays Gonsalves thousands of dollars a month, but she has no HOPE Services phone number, she does not appear on any business or legal documents associated with HOPE Services, and no victims report speaking with her. Finally, because Pacios is hiding assets in Gonsalves' name, if Pacios receives notice of this litigation before assets nominally titled in Gonsalves' name are frozen, Pacios is extremely likely to dissipate or conceal those assets.

(16) In short, the FTC is likely to prevail. Because victims' injuries are severe and Defendants are likely to dissipate and conceal assets, the balance of

---

[3] See Final Order, *FTC v. Lakhany*, No. 8:12-cv-337 (Feb. 28, 2013), DE152 at 13.

1  equities favors the requested relief. If the Court does not issue an *ex parte* TRO
2  with an asset freeze, the likelihood that victims recover is very low.
3
4
5                                    JONATHAN COHEN
6                                    Attorney for Plaintiff
                                     FEDERAL TRADE COMMISSION
7
8  Executed on April 10th, 2015 in Washington, D.C.
9