Thomas J. Borchard, Esq., SBN: 104008
tborchard@borchardlaw.com
Janelle M. Dease, Esq., SBN: 226198
jdease@borchardlaw.com
Sabrina C. Narain, Esq., SBN: 299471
snarain@borchardlaw.com
BORCHARD & CALLAHAN, APC
25909 Pala, Suite 300
Mission Viejo, CA 92691
Telephone: (949) 457-9505
Facsimile: (949) 457-1666

Attorneys for Defendant
DENNY LAKE individually and also
d/b/a JD United, U.S. Crush,
Advocacy Division, Advocacy
Department, Advocacy Agency, and
Advocacy Program

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>    v.<br><br>DENNY LAKE individually and also d/b/a JD United, U.S. Crush, Advocacy Division, Advocacy Department, Advocacy Agency, and Advocacy Program; CHAD CALDARONELLO (a/k/a Chad Carlson and Chad Johnson), individually and as an officer of C.C. Enterprises, Inc.; C.C. ENTERPRISES, INC. (also d/b/a HOPE Services, Trust Payment Center, and Retention Divisions); DEREK NELSON (a/k/a Dereck | Case No.: SACV 15-00585-CJC (JRPx)<br><br><br>**DEFENDANT DENNY LAKE'S OPPOSITION TO ISSUANCE OF PRELIMINARY INJUNCTION**<br><br><br><br><br><br>Date:  May 13, 2015<br>Time:  4:30 p.m.<br>Courtroom: 9B |

1   Wilson), individually and as an officer
    of D.N. Marketing, Inc.; D.N.
2   MARKETING, INC. (also d/b/a, HAMP
    Services and Trial Payment
3   Processing); BRIAN PACIOS (a/k/a
    Brian Barry and Brian Kelly); JUSTIN
4   MOREIRA (a/k/a Justin Mason, Justin
    King, and Justin Smith),
5
6
7                Defendants, and

8   CORTNEY GONSALVES,

9                Relief Defendant.

10

11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///
    ///

1

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………   5

II.     BACKGROUND………………………………………….     5

III.    ARGUMENT…………………………………………………   8

     A.      DEFENDANT LAKE NEITHER PARTICIPATED NOR
        ASSISTED IN THE HOPE DEFENDANTS' ALLEGED
        SCAM…………………………………………………….    8

     B.      THE ASSET FREEZE REQUESTED BY PLAINTIFF
        IS EXCESSIVE…………………………………………   10

        1.   The Scope Of The Asset Freeze Exceeds That
           Which Is Related Or Necessary To Protect The
           Dissipation Of Claimed Assets………………………   10

        2.   Any Freeze of Defendant Lake's Assets Should
           Have a Relationship to Relief Requested and His
           Comparative Culpability……………………...   13

           a.   Defendant Lake Is Not Jointly and Severally
              Liable …………………………………………..   13

           b.   The Complete Asset Freeze Should Be
              Entirely Lifted, or in the Alternative, the
              Restriction Should Be Minimized in
              Proportion to Defendant's Liability and those
              Assets Which are Likely to be Dissipated……   15

IV.     CONCLUSION………………………………………………   16

# TABLE OF AUTHORITIES

**Cases:**

*Burlington Northern and Santa Fe Ry. Co. v. U.S.* (2009) 556 U.S. 559…..….…**14**

*DeBeers Consolidated Mines, LTD. v. United* States (1945) 325 U.S. 212…..**10, 11**

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc*. (1999)

    527 U.S. 308………………………………………………………..…**12**

*FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013)…………………….....…….**9**

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)…………………….…**15**

*Reebok Intern., Ltd. v. Marnatech Enterprises, Inc*. 970 F.2d 552

    (9th Cir. 1992)………………………………………………………**10, 11**

*Republic of the Philippines v. Marcos*, 862 F.2d 1355

    (9th Cir. 1988)………………………………………………………..**11**

*United Alloys, Inc. v. Baker*, 797 F.Supp.2d 974 (C.D. Cal. 2011)…………...**13, 14**

*United State v. Chem-Dyne Corp*., 572 F. Supp. 802 (S.D. Ohio 1983)………….**14**

**Statutes:**

12 C.F.R. §1015.6……………………………………………………..**8**

**Miscellaneous:**

Restatement (Second) of Torts, § 433A,

    comment on Subsection (2) (1976)…..........................................**14**

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant DENNY LAKE individually and also d/b/a JD United, U.S. Crush, Advocacy Division, Advocacy Department, Advocacy Agency, and Advocacy Program, hereby Opposes the Plaintiff's request for Issuance of Preliminary Injunction as follows:

**I.     INTRODUCTION**

Plaintiff Federal Trade Commission's moving papers explain a scam in which defendant Brian Pacios, under a court order banning him from mortgage relief services, orchestrates a means with certain co-conspirators of defrauding homeowners in need of such services.  If the allegations are proven true, the conduct is suitable for injunction.  However, in casting its net to protect the homeowners, the FTC also catches Denny Lake, whose affiliated role with HOPE Services was not to participate in any prohibited or harmful activity, but to genuinely assist homeowners in obtaining mortgage assistance relief.  As an independent third party affiliate, Denny Lake and his Advocacy Department were uninvolved and ignorant of HOPE's activities.  In applying the standard of "substantial assistance" in order to impute liability to Denny Lake, and his comparative responsibility for the harm alleged caused by this scheme, the requested preliminary injunction is overbroad in its scope.

**II.     BACKGROUND**

In his brief background in the business of assisting consumers in obtaining mortgage loan modification, Denny Lake developed what he refers to as the advocacy program, which is a particular strategy of assisting consumers in need of home loan modifications in achieving results.  The advocacy program emphasizes the use of making complaints or appeals for assistance to government agencies, politicians and regulatory entities that oversee the banks, in order to garner attention and expedite a file review by the bank.  The process was developed by Lake through experience, contacts, and trial and error, and referral sources were

generated by word-of-mouth.  The advocacy program became an independent business model, which became known as "JD United" or the "Advocacy Department," working with lawyers and mortgage assistors on a part-time basis. The business operation as a sole proprietorship was never merged into a business entity, not for the purpose of hiding assets as suggested in the moving papers (Plaintiff's Memorandum in Support of Ex Parte Application ("Plaintiff's Memorandum"), at p. 49 – 50), but because the business was in the process of growing from the genesis of a one-man operation.

Lake was introduced to "Brian Barry" and "Chad Carlson" in January 2014, and became a third-party affiliate of their business CC Enterprises, which operated as HOPE Services ("HOPE").  The Advocacy Department was referred loan modification files from HOPE Services, to apply its advocacy program and process paperwork.  The Advocacy Dept. was paid $800 per file by HOPE.  Lake did not take any fees from consumers, nor was he privy to the engagement relationship between HOPE and its clients.

Other than this affiliate agreement, Lake had no relationship with HOPE or its principals, was uninvolved in and unaware of their business practices, and did not share in any profits of their business.  Lake was not involved in consumer intake, and was not aware of nor did he advance any of the violative representations being made.  Lake did not even know the true names of Brian Pacios and Chad Caldaronello until recently.  Lake's isolated role as a third-party affiliate was to advocate and process consumer files, for $800 per file.

In December 2014, Brian Pacios and Chad Caldaronello advised Lake that they were abandoning HOPE to start a mortgage business.  Pacios and Caldaronello further advised that they would be involved in assisting a friend of theirs in opening HP Services in its place, and wanted Lake's Advocacy Department to affiliate, which Lake agreed under the same structure as HOPE. Lake's affiliated with HP Services until it was shut down in April 2015.

1    The role of the Advocacy Department in its affiliation with CC Enterprises
2    and HP Services was to have complaints composed and submitted to government
3    departments/officials and banks on behalf of clients, and assemble and submit
4    requested financial packages to consumer's lenders for the purpose of obtaining a
5    mortgage loan modification.  In fact, these letter that the Plaintiff refers to as
6    "worthless" (Plaintiff's Memorandum, 14:6) were quite effective in their approach.
7    (See attached Declaration of Denny Lake, at para. 23 and 24, and Exhibit A and
8    B).

9    Further, the Advocacy Department's processing function, as facilitated by
10   the complaint advocacy process, had a historical success rate of securing loan
11   modifications for 72% of completed consumer files. (See attached Declaration of
12   Denny Lake, at para. 25, and Exhibit C).  The Plaintiff creates a negative inference
13   that the Advocacy Department does nothing with its files but send complaints and
14   reassure consumers that a modification was pending when it was not.  This is not
15   the case.  The Advocacy Department was performing the work it was retained to
16   do, and was obtaining results.  (See attached Declaration of Denny Lake, at para.
17   23 and 24, and Exhibit A and B).  Loan modifications would often take six months
18   or more to resolve.  Of the $800 per file that Lake would receive from HOPE or
19   HP, he would pay his employees and overhead.  Lake was ignorant of any non-
20   compliant or fraudulent scheme being perpetrated by HOPE or HP, as he was also
21   convinced by HOPE and HP of their legitimacy.  Lake believed he was providing a
22   service to their clients, in did so in many instances.

23   The service of the TRO in this matter on Lake was the first instance that he
24   learned of the practices of  Pacios, Caldaronello and other individuals Lake had
25   either never met or knew only by first name as HOPE employees.  Given the
26   allegations and the content of the moving papers, Lake has no intention of
27   participating in any mortgage relief services in any manner as proscribed by the
28   TRO.  However, the relief being sought herein as against Lake is excessive, given

his tangential relationship with the principal wrongdoers and degree of fault. Lake requests that the Court deny the Preliminary Injunction outright, as the Plaintiff is not likely to succeed in proving the requisite level of Lake's participation in the misconduct, and any offending conduct is not likely to continue. Further, and alternatively, Lake requests that the Court eliminate or limit the freeze of his assets, to allow him to use his own money or borrow funds for his basic needs.

## III.   ARGUMENT

### A.   DEFENDANT LAKE NEITHER PARTICIPATED NOR ASSISTED IN THE HOPE DEFENDANTS' ALLEGED SCAM

Lake is not a direct participant in any scam or non-compliant behavior. Plaintiff is seeking to impose liability on Lake, for the purposes of this motion, based upon the "substantial assistance or support" language of 12 C.F.R. §1015.6. Namely, Plaintiff alleges that Lake knows or consciously avoids knowing that HOPE Services violates the MARS Rule's advance fee ban, but substantially assists HOPE Services' collection of improper advance fees anyway. (Plaintiff's Memorandum, at p. 32:10 – 14).

Lake was engaged by HOPE services to provide assistance to its homeowner consumers in obtaining mortgage loan modifications through his Advocacy Department, which Lake performed. Under Plaintiff's theory of Lake's substantial assistor liability, the Advocacy Department substantially assisted HOPE in collecting advance fees by "helping ensure victims keep making payment to HOPE..." by communicating with client's lenders (Plaintiff's Memorandum, at p. 38:6 - 10) and "reinforcing the false impression that their modifications are moving forward" (Plaintiff's Memorandum, at p. 38:19 – 21). Plaintiff contends that, by negative inference of the Advocacy Department performing work on consumer files, consumers do not realize that they have been defrauded by HOPE. Even if that inference could be proven to be true, it does not implicate Lake as a knowing

1   participant in any wrongdoing.  Further, after files are transferred to the Advocacy
2   Department, clients' files are moving forward until they are terminated by a
3   successful modification, decline, or the client's termination of the process.  No
4   misrepresentations or false impressions were made in that regard; the Advocacy
5   Department was advancing client files towards modification - exactly as they were
6   retained to do.  The Advocacy Department, and their performance of this particular
7   service function, was isolated from HOPE's marketing and other business
8   activities.  Thus, an equal inference could be made that Lake was mitigating the
9   consequences of HOPE's fraud, because that fraud was equally unbeknownst to
10  Lake and the consumer, at HOPE's design.

11      In defining what constitutes "substantial assistance," Plaintiff cites to *FTC v.*
12  *Consumer Health Benefits Ass'n*, No. 10 CIV. 3551 ILG RLM, which states: "[]the
13  threshold for what constitutes 'substantial assistance' is low: 'there must be a
14  connection between the assistance provided and the resulting violations of the core
15  provisions of the TSR.'"  Lake's advocacy process does not result in HOPE's
16  violation of the MARS rule, nor are there any overt acts or representations by the
17  Advocacy Department which would serve to assist in HOPE's collection of
18  advanced fees, which violation by HOPE occurred prior to the file being referred
19  over to the Advocacy Department, according to Plaintiff's explanation of the scam.

20      In the case of *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013), also
21  relied on by the Plaintiff, the court clarified the standard of "substantial
22  assistance," as not requiring a direct connection between the assistance and the
23  violation, but rather something more that causal or incidental.  However in that
24  case, the court did ultimately find that the defendant provided substantial
25  assistance by being an "integral part" of the scheme.  Here, if HOPE's scheme as
26  described in the moving papers is to simply collect consumers' money under false
27  pretenses and not provide the promised services in exchange, then Lake/the
28  Advocacy Department's involvement was unnecessary.  The violation occurred

1  prior to Lake being involved at all.  While HOPE may have used The Advocacy

2  Department as a ploy, Lake did not have that reciprocal intent.  Lake was neither

3  aware of HOPE's platform, nor took any steps to further it.

4  **B.   THE ASSET FREEZE REQUESTED BY PLAINTIFF IS**

5  **EXCESSIVE**

6  **1.  The Scope Of The Asset Freeze Exceeds That Which Is**

7  **Related Or Necessary To Protect The Dissipation Of**

8  **Claimed Assets**

9  The complete asset freeze requested by Plaintiff is excessive because several

10  of the assets restricted are unrelated to a possible dissipation of the claimed assets.

11  Plaintiff emphasizes that "courts often prohibit defendants from using ill-gotten

12  gains to fund their defense." (Plaintiff's Memorandum, pg. 50:16 – 51:1). Plaintiff

13  further states that "a defendant has no Sixth Amendment right to spend **another**

14  **person's money** …" (Plaintiff's Memorandum, pg. 51:2 - 3), in which Plaintiff

15  emphasizes the phrase "another person's money" to bolster its argument. While

16  Plaintiff's position is clear that "money the individual Defendants hold belongs to

17  the homeowners" (Plaintiff's Memorandum, pg. 51: 4-5), it is unclear why Plaintiff

18  has and continues to request by its motion a complete freeze of *all* of Lake's assets,

19  including lines of credit and money loaned to him by third parties, as these types of

20  assets, even if available to Lake, do not belong to the homeowners and are

21  unrelated to the underlying suit.

22  In *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc*., 970 F.2d 552 (9th

23  Cir. 1992), the court discussed a distinguishable but applicable United States

24  Supreme Court case, *DeBeers Consolidated Mines, LTD. v. United* States (1945)

25  325 U.S. 212. *DeBeers* involved a suit under the Sherman Act and the Wilson

26  Tariff Act against several corporations involved in mining gems and diamonds, in

27  which Plaintiff was seeking to restrain future conduct and no money judgment was

28  to be obtained. 325 U.S. at 215, 219.  *Reebok* noted that according to *DeBeers*, an

1    asset freeze was impermissible "because it 'dealt with a matter lying wholly
2    outside the issues in the suit' and 'dealt with property in which in no circumstances
3    can be dealt with in any final injunction that may be entered.'" (970 F.2d at 560
4    (Citing *DeBeers*, 325 U.S. at 220)).  Thus, "a district court does not have the
5    equitable power to order the seizure of defendant's assets when that provisional
6    remedy is in no way related to the district court's power to grant final relief." *Id.* at
7    561.

8          It is true that Plaintiff seeks relief to "redress injury to consumers"…
9    "including but not limited to, … the refund of monies paid, and the disgorgement
10   of ill-gotten monies;" (Complaint, pg. 30: 3-6).  Thereby, Plaintiff may argue that
11   this matter is unlike *DeBeers* where a money judgment may be at issue, if the
12   Court deems just and proper.  Nonetheless the holding in *DeBeers,* specifically the
13   holding that ordering an asset freeze is improper when dealing with property
14   "wholly outside of the issues in the suit" and that "which in no circumstances can
15   be dealt with in any final injunction" is applicable here.

16         A complete freeze which encumbers particular assets such as lines of credits
17   or unsecured money borrowed (or which may be borrowed) from third parties
18   consequently freezes property which is outside of the underlying issue in the suit
19   and property that would never be dealt with in ordering a final injunction or redress
20   to consumers. (*See also Republic of the Philippines v. Marcos*, 862 F.2d 1355,
21   1364 (9th Cir. 1988), in which Defendant acquired specific funds and real
22   property, including bank accounts by way unlawful acts, including fraud and
23   conspiracy, and the district court holding that freezing these assets was within the
24   scope of the injunction as "*the property [was] subject to [the court's] Order*."
25   (emphasis added)).

26         According to Plaintiff, this suit and any equitable relief granted is necessary
27   to "help redress victims."  (Plaintiff's Memorandum, pg. 3: 8). Plaintiff's goal is to
28   disgorge all of the ill-gotten gains and restore as much of those ill-gotten gains to

the allegedly victimized consumers. Yet, Plaintiff proposes to restrict, amongst other restrictions, "Incurring charges or cash advances on any credit card, debit card, or checking card issues in the name, singly or jointly, of [Defendant Lake]." (TRO, pg. 19: 4-5). Additionally, Plaintiff proposes to restrict "Obtaining a personal or secured loan" and "Incurring liens or encumbrances on real property, personal property or other Assets in the name, singly or jointly, of [Defendant Lake]." (TRO, pg. 19: 6-8).

Freezing charges on a line of credit card or cash advances on a debit or checking card surely fall outside of the category of ill-gotten gains, as these types of assets were not nor would be obtained by way of any conduct of Defendant's Lake within the course of his involvement with the remaining defendants. Furthermore, a restriction on incurring liens or encumbrances on property which are unrelated to the underlying suit fall outside of any alleged ill-gotten gains by Defendant Lake.  Plaintiff enters into a lengthy discussion on the standard applied to impose an asset freeze and whether that standard ought to be a "likelihood of dissipation" or a "possible of dissipation." (Plaintiff's Memorandum, pg.47:15-22, and pg. 48: 1-6).  However, regardless which standard is legally applicable, there is little room for argument that assets such as credit card charges, cash advances, loans from third parties, or an by way of example, a lien on real property is possibly or has a likelihood to be dissipated.   A court would lack the jurisdiction to mandate payment of any purported judgment against Defendant Lake by way of assets such as credit cards or third party loans unrelated to the issue at hand. (*E.g. Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc*. (1999) 527 U.S. 308, 333, where the court held that  "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages..")

Therefore, a complete freeze of Defendant's Lake assets which are not of the same character as to that which may be granted finally is excessive and in no way

protects the dissipation of claimed assets as alleged by Plaintiff.  Lake asks the Court to strike the total asset freeze, or alternatively those items unrelated to the claimed assets at issue in this matter.

> **2.  Any Freeze Of Defendant Lake's Assets Should Have A Relationship To Relief Requested And His Comparative Culpability**

The complete asset freeze is also excessive as the freeze bears a disproportionate relationship to the Lake's potential liability. Not only is the application of joint and severally liability improper, in that, at most, Defendant Lake is comparatively liable, but the complete asset freeze should be either lifted in its entirety or minimized to reflect Defendant Lake's proportionate liability with respect to those assets which are likely to be dissipated.

> **a.  Defendant Lake Is Not Jointly And Severally Liable**

Plaintiff seeks to enjoin defendants on the basis of violating the MARS rule and TSR, both regulations of which are silent on the remedy with respect to a defendant found to have substantially assisted or consciously avoided others violation of the same.  More specifically, neither set of regulations set forth the standard or authority to order joint and several liability as requested by Plaintiff's Complaint against Defendant Lake. (Plaintiff's Complaint, pg. 23:19-20; pg.28: 7-8). Therefore, the federal common law principles of joint and several liability apply in determining whether Defendant Lake should be jointly and severally liable.

It is well established that "when two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused …. But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *United Alloys, Inc. v. Baker*, 797 F.Supp.2d 974, 998 (C.D. Cal.

2011) citing *United State v. Chem-Dyne Corp.* (1983) 572 F. Supp. 802, 810 (S.D. Ohio). Thus, in order to avoid joint and several liability, a defendant has the burden of proving that the harm is capable of apportionment. *Burlington Northern and Santa Fe Ry. Co. v. U.S.* (2009) 556 U.S. 559,614.  The *Restatement (Second) of Torts*, § 433A (1976), comment on Subsection (2) further aides that apportionment is inappropriate in cases where the harm is not capable of reasonable, logical, or practical division.

Applying these common law principals, Lake should not be held jointly and severally liable as proposed by Plaintiff.  Plaintiff asserts, "there are approximately 432 victims who lost mortgage payments or reinstatement fees to the defendants…." (Plaintiff's Memorandum, pg. 2: 21-22).  Additionally, Plaintiff asserts that "the average loss per victim is more than $4,300." (Plaintiff's Memorandum, pg. 2: 24). Therefore, Plaintiff implies a total loss to victims in the sum of approximately $1,857,600.

If a court were to find that Defendant Lake substantially assisted in any violation by the remaining defendants, Defendant Lake could only be subject to a judgment according to a portion of the total harm of $1,857,600.  Defendant Lake was compensated $800 on a per file basis, the majority of which was not retained by Lake, but rather dispersed to employees or for overhead.  Thus, if Plaintiff can prove that the source of the $800 was generated from money received by the homeowners, which is not established or addressed in the moving papers, Lake's liability could not fairly be apportioned more than $800 per file, at most. Since a court can reasonably and logically divide and apportion a definite figure as to Defendant's Lake liability, Lake would not be held to be jointly and severally liable for the total sum of whatever judgment may be entered.

///

///

///

**b. The Complete Asset Freeze Should Be Entirely Lifted, Or in the Alternative, the Restriction Should Be Minimized in Proportion to Defendant's Liability and those Assets Which are Likely to be Dissipated**

In light Defendant's proportionate liability, Lake requests that the Court unfreeze his assets in their entirety, or in the alternative, minimize the restrictions, including restrictions on the use of credit cards, cash advances of credit cards, debit or checking cards, third party loans, and liens on real or personal property. While a complete asset freeze would be justified because of Lake's limited potential liability and the Plaintiff's overreaching restraining order, if the court were to decide to minimize the restrictions, a partial asset freeze could be fashioned accordance with the to the relief likely awarded as a judgment.

As briefly discussed above, Plaintiff's moving papers include a lengthy discussion in an effort to argue the applicability of a lower standard of finding a dissipation of assets to determine whether an asset freeze is appropriate. However, Plaintiff entirely dismisses and dances around the clear finding of the court in *Johnson v. Couturier* 572 F.3d 1067, 1085, footnote 11(9th Cir. 2009), that the "*Sahni* decision is overruled" with respect to applying "a possibility of dissipation of assets" standard. Plaintiff's basis for this bold argument is that "*Johnson* limited *Sahni* in a private context where the court could not presume 'irreparable harm.'" (Plaintiff's Memorandum, page 48, lines 12-13.) However, this Defendant has not been able to locate where in the *Johnson* opinion, the condition of a "private context where court could not presume irreparable harm" exists, mainly because no such condition existed when the *Johnson* completely overruled this aspect of *Sahni* with very little discussion, if any. Therefore, the "likelihood of dissipation" standard must be applied when justifying an asset freeze, especially when justifying a complete asset freeze.

1       Nonetheless, as stated above, regardless of the standard applied in justifying

2  an asset freeze, there is no possibility or likelihood that lines of credit, third party

3  loans, or liens on real or personal property are any types of assets that are going to

4  be dissipated at the time of a final order. Therefore, in addition to the above

5  reasoning establishing Defendant Lake's proportional liability, the complete asset

6  freeze should either be completely unfrozen, or in the alternative, such restrictions

7  should be minimized.

8  **IV.    CONCLUSION**

9       Denny Lake has found himself erroneously on the wrong side of this fight,

10  and is now being sued by the same entity which he formerly looked to in

11  advocating for assistance on behalf of his clients.  Lake's relationship with HOPE

12  was as a third-party affiliate, not an active participant in any fraudulent scheme,

13  but a hired service provider.  The conduct of the HOPE defendants should not be

14  impute to Lake, as his conduct neither meets the standard of  "substantial

15  assistance," nor is anywhere comparatively near the culpability of the remaining

16  defendants.  Accordingly, the conduct which the Plaintiff seeks to restrain as to

17  Denny Lake is unnecessary and excessive.

18

19

20

21  DATED:  May 8, 2015

22                                   By:   /s/ Janelle M. Dease

23                                   THOMAS J. BORCHARD

                                 SBN 104008; tborchard@borchardlaw.com

24                                   JANELLE M. DEASE

                                 SBN 226198; jdease@borchardlaw.com

25                                   SABRINA C. NARAIN

                                 SBN: 299471; snarain@borchardlaw.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendant
DENNY LAKE individually and also
d/b/a JD United, U.S. Crush,
Advocacy Division, Advocacy
Department, Advocacy Agency, and
Advocacy Program

## PROOF OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Orange, State of California, and not a party to the above-entitled cause.  My business address is 25909 Pala, Suite 300, Mission Viejo, CA.

On May 8, 2015, I caused a true and correct copy of **DEFENDANT DENNY LAKE'S OPPOSITION TO ISSUANCE OF PRELIMINARY INJUNCTION**

to be served as follows:

Via ECF:

Jonathan Cohen
Miriam R. Lederer
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-9528
Washington, DC 20580

Andrew W. Robinson
Daniel M. Benjamin
McNamara Benjamin LLP
501 West Broadway, Suite 2020
San Diego, CA 92101


By Electronic Mail:

Brian Pacios
bpacios2012@yahoo.com

Chad Caldaronello
chadchomeloans@cox.net

Cortney Gonsalves
autumnrosesmommy@yahoo.com

Justin Moreira
justinmoreira07@yahoo.com

Derek Nelson
dnelson222@gmail.com

Executed on May 8, 2015, at Mission Viejo, CA.  I hereby certify under the penalty of perjury that the foregoing is true and correct.

 /s/ Janelle M. Dease
Declarant