JONATHAN COHEN
DC Bar No. 483454; jcohen2@ftc.gov
MIRIAM R. LEDERER
DC Bar No. 983730; mlederer@ftc.gov
600 Pennsylvania Ave., NW, CC-9528
Washington, D.C. 20580
202-326-2551 (Cohen); -2975 (Lederer); -3197 (fax)

JOHN D. JACOBS (Local Counsel)
CA Bar No. 134154, jjacobs@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
310-824-4343; -4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

DENNY LAKE (also d/b/a JD United, U.S. Crush, Advocacy Department, Advocacy Division, Advocacy Program, and Advocacy Agency); CHAD CALDARONELLO (a/k/a Chad Carlson and Chad Johnson), individually and as an officer of C.C. Enterprises, Inc.; C.C. ENTERPRISES, INC. (also d/b/a HOPE Services, Trust Payment Center, and Retention Divisions); DEREK NELSON (a/k/a Dereck Wilson), individually and as an officer of D.N. Marketing, Inc.; D.N. MARKETING, INC. (also d/b/a HAMP Services and Trial Payment Processing); BRIAN PACIOS (a/k/a Brian Barry and Brian Kelly); JUSTIN MOREIRA (a/k/a Justin Mason, Justin King, and Justin Smith),

    Defendants, and

CORTNEY GONSALVES,

    Relief Defendant.

Case No. SACV 15-0085-CJC-(JPRx)

**PLAINTIFF'S REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION AGAINST DEFENDANT DENNY LAKE**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................1

NEW EVIDENCE PROVING LAKE'S ROLE AND KNOWLEDGE ...................2

     A.   New Evidence Concerning Lake's Knowledge ....................................2

     B.   New Evidence Concerning Lake's Substantial Assistance...................4

     C.   New Evidence Connecting Lake and Pacios.........................................8

ARGUMENT .....................................................................................................10

I.    Lake Substantially Assisted HOPE Services' Theft....................................10

     A.   There is No Causation Requirement ..................................................10

     B.   Lake's Actions Caused Substantial Injury .........................................11

II.   The Asset Freeze is Necessary and Appropriate .........................................12

     A.   "Comparative Culpability" Is Irrelevant to the Asset Freeze .............12

     B.   Lake's Other Asset Freeze- Related Arguments Are Meritless..........13

         1.   Allowing Lake to Incur Debt Will Injure Third Parties ..........13

         2.   Joint and Several Liability is the Correct Standard.. ...............13

         3.   Consumer Loss Is the Proper Redress Measure ......................15

CONCLUSION ..................................................................................................16

# TABLE OF AUTHORITIES

**Published Cases**

*Burlington Northern v. United States*, 556 U.S. 559 (2009) ...................................15

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)........................................11

*FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013).............................................. 10-11

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) ..................................... 15-16

*FTC v. HES Merch. Servs.*, No. 6:12-CV-1618, 2015 WL 916349
  (M.D. Fla. Feb. 11, 2015) ...................................................................................14

*FTC v. HES Merch. Servs.*, No. 6:12-CV-1618, 2014 WL 6863506
  (M.D. Fla. Nov. 18, 2014) ..................................................................................11

*FTC v. Sharp*, 782 F. Supp. 1445 (D. Nev. 1991) ..................................................14

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ...................................................16

*FTC v. Transnet Wireless Corp.*, 506 F. Sup. 2d 1247 (S.D. Fla. 2007) ...............14

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ...........................12

*Reilly v. Anderson*, 727 N.W.2d 102 (Iowa 2007)..................................................14

*United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961
  (C.D. Ill. 2009)...................................................................................................10

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179 (Minn. 1999)...............14

**Statutes**

12 U.S.C. § 5538..........................................................................................................13

15 U.S.C. § 57a ............................................................................................................13

**Regulations**

12 C.F.R. § 1015.6 ........................................................................................... *passim*

16 C.F.R. § 310.3 .........................................................................................................10

16 C.F.R. § 310.4 .........................................................................................................10

60 FED. REG. 30,406 (June 8, 1995) ..........................................................................10

60 FED. REG. 43,842 (Aug. 23, 1995) ........................................................................11

75 FED. REG. 75,091 (Dec. 1, 2010) ..........................................................................10

**<u>Other Authorities</u>**

RESTATEMENT (SECOND) OF TORTS § 876 (2007) .............................................. 14-15

RESTATEMENT (SECOND) OF TORTS § 433A (2007) ................................................15

**INTRODUCTION**

On April 16, at the Temporary Receiver's invitation, FTC investigators and forensic experts copied information located at Defendants' business premises. This new evidence confirms the FTC's two core allegations:  (1) HOPE Services steals homeowners' mortgage payments; and (2) Defendant Denny Lake knowingly aids and abets that theft.

Although all the other individual Defendants have stipulated to Preliminary Injunctions ("PIs"),[1] Defendant Lake asserts two primary arguments against a PI—both of which are factually wrong and legally irrelevant.  First, Lake denies that he "assist[ed] HOPE Services in the collection of improper advance fees[.]"[2] Factually, this is false.  The new evidence proves beyond doubt that Lake helped HOPE Services collect illegal advance fees.[3]  Moreover, Lake's contention is legally irrelevant, because the "assisting and facilitating" provision does not require a causal or direct connection between the assistance and the violation.

Second, Lake pleads that the Court's asset freeze is "disproportionate to [his] culpability."[4]  Factually, Lake is wrong again.  As discussed below, Lake's culpability is substantial because he actively assisted the thefts.  Lake's contention is also legally irrelevant.  At the PI stage, the likelihood of Lake's liability is what determines whether the freeze should continue, not his "culpability."  The FTC has already proven a substantial likelihood of success, and the new evidence shows that Lake is highly culpable.  Therefore, the proposed PI (including an asset freeze) is appropriate.

---

[1] The two corporate defendants have not answered or otherwise opposed the FTC's motion for a Preliminary Injunction with respect to them.  Accordingly, we ask the Court to enter PIs against them (proposed orders are attached).

[2] Joint Status Report (DE59) (May 7, 2015) at 1.

[3] Except where the context requires greater specificity, we refer to HOPE and HAMP Services collectively as "HOPE Services."  *See* TRO Mem. at 3-5.

[4] Joint Status Report (DE59) at 1.

## NEW EVIDENCE PROVING LAKE'S ROLE AND KNOWLEDGE

### A.    New Evidence Concerning Lake's Knowledge

During the immediate access, the FTC located significant additional evidence that Lake knew how HOPE Services induced trial payments.[5] Specifically, as the FTC's TRO Memo explains, HOPE Services sends paperwork to homeowners "approved" for loan modifications, including a term sheet detailing their new loans and the dates when trial payments are due. *See* TRO Mem. at 12-13. On February 27, 2014 (around the time the fraud began), Lake emailed Pacios and Caldaronello: "Here is something similar to what you are doing that is more honest and compliant." Ostrum 2 ¶13:1 at 48-50. Lake attached alternative paperwork that differed from what HOPE Services ultimately used.[6] Most important, Lake's somewhat "more honest" alternative did not represent that the homeowner has a government-backed modification agreement with his lender contingent upon making three trial payments. Significantly, however, Lake knew HOPE Services was not using the "more honest" variant, or anything like it.

Only two weeks later, another victim communicated to Lake about the payments. In fact, Lake reported to Pacios that a homeowner HOPE Services referred to Advocacy Department "wondered why they needed to do an interview [with Advocacy Department] since they were already approved and had been making payments to the bank." Ostrum 2 ¶13:1 at 55. Lake cautioned Pacios that

---

[5] During the immediate access, FTC forensic experts and investigators collected information, including forensic images of certain computers and cellphones. Declarations from nine forensic experts, investigators and eDiscovery specialists are attached hereto. *See* Ostrum 2, Pickerrell, Huettner, Kaplan, Brown, Patel, Johnson, King, and Sutton.

[6] *Compare* Ostrum 2 ¶13:1 at 49-50 *with id.* ¶14:2 at 139 *and id.* ¶15:3 at 140. Notably, however, Lake's "more honest" alternative is still deceptive and comes nowhere close to complying with the MARS Rule; it is merely less deceptive than the one that Lake gently suggested revising.

1   "leading people to believe they are paying the bank directly is not a recipe for long

2   term success." *Id.*

3        Indeed, over the next year, multiple "clients" HOPE Services forwarded to

4   Lake repeatedly informed him that they believed their trial payments had already

5   secured a loan modification.[7]  These communications further prove Lake knew

6   about the illegal payments. For instance, one consumer emailed Lake: "I was told

7   [] I was approved for a loan . . . with a reinstatement fee and 3 monthly trial

8   payments to establish my loan." Ostrum 2 ¶13:1 at 111. Lake told Pacios and

9   Caldaronello that he "tried to smooth things over" with this victim. *Id.* In another

10  email to HOPE Services, Lake noted that a homeowner "was under the impression

11  that the payments were going directly to Chase [her lender]," and was "panicking."

12  Ostrum 2 ¶13:1at 91.  In his subject line, Lake informed Pacios and Caldaronello

13  that this homeowner "needs to be talked off the ledge."[8]  *Id.*

14

15

---

16

17   [7] This evidence refutes Lake's claim that "[t]he service of the TRO in this
     matter on Lake was the first instance that he learned of the practices of Pacios

18   [and] Caldaronello[.]" Opp. at 7.

19   [8] Indeed, many Lake emails contain reports from consumers from whom
     HOPE Services had stolen payments.  For instance, Lake warned HOPE Services

20   about a "PROBLEM file": "We [Advocacy Department] just got a call from the
     Nationstar Fraud department, they claim that [their mortgagor] contacted them and

21   believes he is approved with Nationstar and that he has paid funds to Nationstar
     through [HOPE] Services." Ostrum 2 ¶13:1 at 95.   In another email to Pacios and

22   Caldaronello (subject: "Richard Kelly—red flags"), Lake relayed that a
     homeowner stated "he was already approved and he already sent over the

23   paperwork so why would he need to talk to me [Lake]. . . . [I] wanted to give you
     a heads up that this could be an issue[.]"  *Id.* at 103.  In yet another email (subject:

24   "Tatyana Boltyansky problem"), Lake warned that Boltyansky "asked about the
     payments the lender had already received and [the] lender said no payments were

25   received—Tatyana then sent over the [HOPE] approval to [the] bank and they told
     her not legitimate, etc." *Id.* at 72.  Another time, Lake reported that a homeowner

26   informed her lender (Wells Fargo) that "she is already approved for a trial payment
     through HOPE and Wells said she was not. . . . [T]hey have opened an

27   investigation."  *Id.* at 66.  Lake asked Pacios and Caldaronello to call the
     homeowner "so we can get ahead of this."  *Id.*

28

Significantly, although Lake knew from the outset that HOPE Services was simply stealing payments, there is no evidence that Lake ever informed any of these victims what had transpired. Indeed, as discussed below, he did everything he could to ensure victims continued to pay HOPE Services.[9]

## B.    New Evidence Concerning Lake's Substantial Assistance

As the TRO Memo explains, Lake helped keep payments coming by creating the impression that the modification process HOPE Services allegedly initiated was continuing, and by filtering lender communications that would otherwise reveal the theft to homeowners. *See* TRO Mem at 38-39. Additionally, new evidence establishes that Lake provided substantial assistance in at least six other respects.

First, Lake actively worked to encourage or facilitate payments. For instance, even when Lake apparently obtained some form of modification for a victim, he still worked to structure the genuine trial payment process to make HOPE Services' continued theft possible. In a particularly telling email exchange, HOPE Services "loan counselor" Michael Paquette (a/k/a Mike Richards) emailed Lake (with a copy to Pacios). Ostrum 2 ¶13:1 at 56. Paquette explained that HOPE Services had set up a second "trial payment" for a homeowner due on April 7, but his lender's (genuine) trial mortgage payment was due on April 1. *See id.*

---

[9] Additionally, although ignorance of the law is not a defense, Lake knew that advance fees were illegal. Lake met at length with the Receiver's deputies, and he admitted "that there really isn't a way to do [his] business legally" without involving an attorney. Receiver's Report (DE64) at 15. Notably, in early 2014, Lake wrote: "[A]s a general rule only Attorneys are eligible to charge an advance fee. . . . [T]echnically California law forbids the collection of advance fees for ANYTHING relating to modification[.]" Ostrum 2 ¶21:9 at 307-308. Furthermore, when terminating his relationship with an earlier entity that generated modification business for Lake, he alleged that the entity's principal was "engaging in an illegal business.   You accepted close to 2 million dollars in advance fees from homeowners[.]" Ostrum 2 ¶27:14 at 365; *see also id.* ¶13:1 at 124 (complaining that mediators "immediately cry foul if they hear that someone has paid an advance fee").

As Paquette explained, the homeowner "cannot pay both payments and we were hoping to collect at least 1 more payment from him this month in order for this file to make a little more sense for everyone." *Id.* In response, Lake promised to contact the lender and "see if the first [real] payment can be pushed out to May 1." *Id.* This would enable HOPE Services to steal another payment before the homeowner began the genuine trial payment process.

To provide another example in which Lake encouraged payments, Caldaronello explained to Lake that a victim had his (fake) trial payment "coming up and [he] is a little nervous. The bank called him and told him it was a scam. . . . I really need you [Lake] to speak with him and reassure him that all is good." *Id.* ¶13:1 at 119. Lake agreed to do so. *Id.* In ways like this, Lake encouraged homeowners to make additional payments HOPE Services could steal.[10]

Second, Lake helped HOPE Services by assuaging homeowners' concerns when they arose. For instance, Lake asked Pacios to call a homeowner because he "is kind of freaking out and wanting to know where his money went, etc. . . . . We did our best to calm him down and explain what was going on but he requested a call from [you]." Ostrum 2 ¶13:1 at 63 (subject: "Joseph Watson—needs a call"). In another case, Pacios explained to Lake that a homeowner's "attorney said our paperwork was not authentic." Ostrum 2 ¶13:1 at 97. The homeowner remained "on board," but Pacios asked Lake to call her because she "needs a little reassurance and hand holding[.]" *Id.* Lake confirmed that Advocacy Department would reach out to her. *Id.* Of course, by reassuring victims that nothing was wrong, Lake helped keep payments coming.

---

[10] In another case, Pacios asked Lake for help because the victim was "giving a lot of push back to make a payment because he is still getting calls from lender saying they have nothing on file." Ostrum 2 ¶26:13 at 363. Pacios asked Lake to contact the lender, to keep the victim "happy and in [the] process." Lake's response: "Good idea. On it." *Id.*

Third, Lake helped "prepare" victims for appearing at foreclosure proceedings without attracting potentially problematic attention. Specifically, Lake instructed a HOPE Services employee what to tell a homeowner facing a foreclosure-related court appearance: "As part of the court date they ask if [the] client paid a third party—when the client says yes, someone at the court will ALWAYS tell them they should not have done so—we try to prep them for this if we are doing talking points but that is what you should address when you talk to this guy[.]" Ostrum 2 ¶13:1 at 61. This is yet another way that Lake helped conceal the fraud.

Fourth, Lake helped hide Pacios and Caldaronello from their victims. As the Court is aware, in late 2014, HOPE Services became "HAMP Services," "Brian Barry" became "Brian Kelly," and so forth. *See* TRO Mem. at 3-5. Lake also knew this. *See infra* at 10 n.18. Yet when HOPE Services' victims asked Lake for help reaching HOPE Services, he lied to them. In one instance, Lake wrote to a victim: "As far as the application of your payments, all we can do is try to contact Chad Carlson on your behalf. We are a third party and have no knowledge or involvement in fees paid or application of funds. . . . [T]here is little communication between their office and ours at this time. They have instructed me to give you [an] address and you can send them a written request[.]"[11] In this way as well, Lake perpetuated the fraud by covering for HOPE Services.

Fifth, Lake informed HOPE Services when it needed to call particular homeowners who might learn that they were victims. In one instance, after speaking with both his lender and the government, a victim called Lake, "was upset and repeatedly said we were part of HAMP services' 'scam.'" *Id.* ¶13:1 at 107. Lake warned Pacios that this "guy needs a call." *Id.* In another case, through

---

[11] Lake similarly instructed his employees to direct HOPE Services' victims with questions to call an old HOPE Services number, or to send mail to an old HOPE Services maildrop. Ostrum 2 ¶17:5.

an email to Pacios and Caldaronello (subject: "please resolve this"), Lake warned that a homeowner had "sent your paperwork to HUD," where it "set off red flags."[12] *Id.* at 77.  Through emails like these, Lake alerted HOPE Services to "problems" they needed to solve, thereby keeping the fraud going.

Sixth, as the FTC's TRO Memo explained, Lake assisted the fraud simply by failing to disclose to victims that he knew their supposed "trial payments" never reached their lenders. *See* TRO Mem. at 38.  In fact, victims inundated Lake with requests that he explain what happened (or was happening) to their payments, but Lake usually deflected these questions back to Pacios and Caldaronello. *See, e.g.,* Ostrum 2 ¶13:1 at 121 (subject:  William Friedrich—PROBLEM") ("Client is upset at [Caldaronello] and feels he was misled and wants [a] call regarding funds paid.").[13]  Lake also instructed his employees to conceal information about HOPE Services' trial payments: "if someone wants to discuss funds paid do not engage . .

---

[12] Lake urged them to "get a refund out," apparently hoping to avoid regulatory attention. *See* Ostrum 2 ¶13:1 at 77.  Lake's employees also knew the drill.  When a consumer "question[ed] the three trial payments and their legitimacy," the employee asked Lake to "have one of the guys at hope give him a call[.]" *Id.* at 73.  Lake forwarded the message to Pacios and Caldaronello." *See id.*  Additionally, when Lake learned that two homeowners hired an attorney and contacted regulators, he texted Caldaronello about this "major fire" and asked him to address it. *Id.* ¶13:1 at 94.  In another email, Lake told Pacios and Caldaronello that a homeowner "called here serval times and wants to know where her money went, what is going on etc etc." *Id.* ¶13:1 at 76.  Lake's subject line read:  "Sandra Ramirez off the rails—must get a call." *Id.*

[13] *See also* Ostrum 2 ¶13:1 at 69 (Lake to Pacios and Caldaronello; "Called client to go over the approval, new payment of $1252 with three trial payments. Client insists she already made her trial payments (to you guys) and wants to know where the money went."); *id.* at 67 (Lake to Pacios and Caldaronello; subject: "James Cull needs a call"; homeowner called "with a Wells Fargo rep on the line and was asking a lot of questions about his Wells Trust account.  The rep was telling him they did not have these funds[.]"); *id.* at 62 (Lake to Pacios and Caldaronello; "he is concerned about where his payments are going and would like someone at HOPE to give him a call"); *id.* at 64 (Lake to Pacios; "they would like you to explain how and where their funds were applied"); *id.* at 71 (Lake asking Pacios and Caldaronello to address the homeowner's question:  "[w]hat happens to the 3 payments of $901 that we made to the trust account??").

1  . we do not have any direct knowledge or information regarding payments, how

2  they are applied, etc." *id.* ¶16:4at 143.  By hiding HOPE Services' theft, monthly

3  "trial payments" continued, and Lake greatly exacerbated the injury.

4      **C.**   **New Evidence Concerning Lake's Substantial Assistance**

5        During the immediate access, the FTC also located new evidence connecting

6  Lake and Pacios.  Notwithstanding Lake's sworn claim that he "was introduced to

7  'Brian Barry' and 'Chad Carlson" in January 2014," Lake ¶7, Lake met Brian

8  Pacios (by his real name) in January 2014, shortly before the HOPE Services fraud

9  began.  Significantly, Lake had a "close personal friend," Barry Gabster, who sold

10  mail marketing.[14]  In January 2014, Lake emailed Gabster:  "[S]ome guy I didn't

11  know had been calling me about [Advocacy Department] . . . .  Turns out . . . the

12  guy is **Brian Pacios**."  Ostrum 2 ¶22:10 at 311 (emphasis added).  Pacios and Lake

13  planned to meet "about doing back end for a friend [that Pacios] is doing a small

14  shop with.  Might be some marketing $ for Barry [Gabster]??"[15]  *Id.*  Subsequently,

15  as Gabster explains, "companies Pacios worked for hired [him] to send out loan

16  modification advertisements."  Gabster ¶4.  Both Gabster and Lake knew that

17  "Pacios' mailers were designed to generate phone calls to the company or

18  companies with which Pacios was associated, and that the mailers advertised loan

19  modifications."  *Id.* ¶6.  Lake further "knew that Pacios was forwarding clients

20  who called to Lake's 'Advocacy Department.'"  *Id.*  Thus, Lake and Pacios

21  coordinated from the outset.

22

23

_____

24

25  [14] Gabster worked alongside Lake at a law firm placed into receivership for a
scam marketed to distressed homeowners.  *See* TRO Mem. at 13 n.43; Gabster

26  ¶¶1-2.  Gabster then rejoined Lake at Advocacy Department, sometimes referring
to himself as its "vice-president."  Gabster ¶3.  In 2013, however, Gabster departed

27  and began a business "help[ing] companies send out" mailers.  *Id.* ¶4.

28  [15] Pacios' "friend" was presumably Chad Caldaronello, whose "small shop"
was C.C. Enterprises (HOPE Services).

Gabster worked with Pacios over the next year to help him send mailers. Initially, Gabster's work-related emails went to "Brian Barry" (of HOPE Services). Ostrum 2 ¶23:11 at 312-18. Later, Gabster's emails went to "Brian Kelly" (of HAMP Services). *Id.* at 344-56. In fact, in late October 2014—roughly when HOPE morphed into HAMP—Gabster sent the same email about marketing to both "Brian Barry" and "Brian Kelly." *Id.* at 342. Also during this period, Gabster continued his close relationship with Lake, and they sometimes discussed business "[w]hen [they] communicat[ed] socially[.]"[16] *Id.* ¶5. In short, contrary to Lake's claim,[17] Lake and Pacios had a close connection throughout the HOPE Services fraud.[18] This underscores that Lake knew (or consciously avoided knowing) exactly what HOPE Services did.

---

[16] Lake also likely knew that HOPE Services' mailers advertised modifications, not his amorphous "advocacy" services. Although Gabster denies Lake knew "exactly" what the advertisements said, *see* Gabster ¶7, even if one credits this aspect of his declaration, Lake's alleged failure to inquire as to what the mailers marketed is conscious disregard for what the advertising claimed.

[17] *See* Lake ¶7; *see also* Opp. at 6 (presumably relying on Lake's sworn declaration to assert that "Lake did not even know the true names of Brian Pacios and Chad Caldaronello until recently."). This is not Lake's first (or second) perjury. *See* TRO Mem. 44-45.

[18] Lake also implies that he did not know Pacios and Caldaronello were involved with HOPE Services' successor (HAMP Services). *See id.* ¶¶18-19 (stating that Pacios and Caldaronello advised him that "a friend of theirs" would open HOPE Services' replacement, and that they would open a separate business); However, Lake's communications prove he knew Barry, Kelly and Pacios were the same person, and that Carlson, Johnson and Cardaronello were also the same person. Significantly, Lake texted Caldaronello about loan modification issues at the same telephone number during both Caldaronello's "Chad Carlson/HOPE Services" period, and during his later "Chad Johnson/HAMP Services" period. Ostrum 2 ¶25. Likewise, Pacios' cellphone records show numerous calls between Lake and Pacios during both Pacios' "Brian Barry/HOPE Services" period, and during his later "Brian Kelly/HAMP Services" period. *Id.* Additionally, the fact that Lake and Pacios coordinated from the beginning further belies Lake's claimed ignorance. *See supra* at 9-10.

1

## ARGUMENT

2  **I.   Lake Substantially Assisted HOPE Services' Theft.**

3     **A.   There Is No Causation Requirement.**

4     Lake's primary legal argument on the merits is that the MARS Rule's

5  "assisting and facilitating" provision contains an implied causation element.  *See*

6  Opp. at 9 (claiming that "Lake's advocacy process does not result in HOPE's

7  violation of the MARS Rule," and that he could not have assisted violations

8  because they (allegedly) occurred before he took any action).  However, 12 C.F.R.

9  § 1015.6 does not contain a causation requirement, and if one were intended, the

10  regulation would include it expressly.[19]  In fact, the Notice announcing the Final

11  Rule specifically identified Lake's activity—the "back-end handling of consumer

12  files"—as conduct that could qualify as "substantial assistance."  75 FED. REG.

13  75091, 75123 (Dec. 1, 2010).  Because the "back-end handling of consumer files"

14  could not cause, for instance, the misrepresentations that the MARS Rule prohibits,

15  the Commission's Notice further underscores the absence of any causation

16  requirement in § 1015.6.

17     Additionally, § 1015.6 is identical to the TSR's assisting and facilitating

18  provision.  When rejecting an argument in a TSR appeal similar to the one Lake

19  advances here,[20] the Tenth Circuit noted that the Commission originally proposed

20  _____

21     [19] In fact, the Telemarketing Sales Rule ("TSR") is analogous to the MARS

22  Rule in some respects, and—although certain TSR provisions contain a causation
   requirement, *see, e.g.*, 16 C.F.R. § 310.4(b)—the TSR's identical assisting and

23  facilitating provision also does not have a causation element, *see id.* § 310.3(b).
   Notably, one court used the difference in language between these two TSR

24  provisions to conclude that the Commission "did not intend to limit the scope of
   the plain meaning of the verb 'cause'" where it did appear.  *See United States v.*

25  *Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 958 (C.D. Ill. 2009).

26     [20] *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) ("Ms. Chapman
   argues her actions did not constitute substantial assistance under the [TSR] because

27  she was not involved in the marketing efforts and thus her assistance was not
   directly connected to the misrepresentations made to consumers.  However, this

28  type of direct connection is not required.").

that the assistance be "related to" the unlawful act, *see* 60 FED. REG. 30,406, 30,414 (June 8, 1995), but it removed that limitation in the Final Rule, *see* 60 FED. REG. 43,842, 43,851 (Aug. 23, 1995). *See Chapman*, 714 F.3d at 1216.  In fact, two courts have found parties liable for "assisting and facilitating" even when they did not assist until after the violations occurred.  *See id.* (holding individual liable who provided the materials that were sold, but did not market them herself); *FTC v. HES Merch. Servs. Co.*, No. 6:12-CV-1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014) (holding payment processor provided "substantial assistance" "as a matter of law" although the misrepresentations occurred before victims payments were processed), *appeal docketed*, No. 11-11500 (11th Cir. Apr. 8, 2015).

### B.   Lake's Actions Caused Substantial Injury.

Even assuming (incorrectly) that 12 C.F.R. § 1015.6 contains an implied causation requirement, Lake caused substantial injury by helping keep victims making payments he knew HOPE Services would steal.  Notably, the new evidence presented above confirms the evidence set forth in our opening brief.  *See* TRO Mem. at 38-39.  For instance, the opening brief established that Lake informed one victim (Wofford) that, if she "made [her] three trial payments, they would make [her] modification permanent."[21]  *Id.* at 33 (quoting Wofford ¶19).  Lake's opposition conspicuously fails to address the evidence the FTC's opening

---

[21] A Lake employee also called Wofford and asked her to "make the third and final trial payment so that [she] could get a permanent loan modification." TRO Mem. at 33 (quoting Wofford ¶33).  This is consistent with what another Lake employee told the FTC's undercover investigator about her HOPE Services payments on a recorded call:  "[Y]ou need to keep doing what you're doing with [HOPE Services], okay?"  TRO Mem. at 34 (citing Ostrum ¶92:41 at 475).  Again, Lake's Opposition does not address this evidence.

1    brief presents.  In short, even assuming (erroneously) that 12 C.F.R. § 1015.6

2    requires causation, Lake caused substantial injury.[22]

3    **II.    The Asset Freeze Is Necessary and Appropriate.**

4        **A.    "Comparative Culpability" Is Irrelevant to the Asset Freeze.**

5        Lake contends that the Court should modify its asset freeze to reflect his

6    "comparative culpability."  However, "comparative culpability" is irrelevant to

7    whether an asset freeze is necessary—the likelihood of liability and the need for

8    redress are the salient considerations.  As the FTC explained, *see* TRO Mem. 24-

9    25, the court (1) "weighs the equities" and (2) "consider[s] the FTC's likelihood of

10   ultimate success[.]"  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir.

11   1989).  Both factors militate even more strongly in favor of preliminary relief now

12   than they did at the *ex parte* TRO stage.  Lake now has counsel, which reduces the

13   private interest at risk with an *ex parte* proceeding, and he had roughly a month to

14   oppose this motion.  Furthermore, the evidence against Lake is now even more

15   substantial than that presented at the TRO stage, when the Court properly found

16   sufficient evidence with respect to Lake's liability to justify temporary relief.

17       Furthermore, because the FTC is highly likely to prevail, an asset freeze is

18   necessary to preserve the possibility of restitution for victims.  *See* TRO Mem. at

19   47.  Given Lake's dishonesty, he cannot be trusted to voluntarily preserve assets he

---

21       [22] Lake also claims that "any offending conduct is not likely to continue."

22   Opp. at 8.  However, "an action for an injunction does not become moot merely
     because the conduct complained of was terminated, if there is a **possibility** of

23   recurrence, since otherwise the defendant's would be free to return to [their] old
     ways."  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir. 1999)

24   (quotation omitted) (emphasis added).  Here, the relevant question is not whether
     Lake will continue to conspire with the HOPE Defendants, but whether there is a

25   possibility that he will violate the regulations at issue in any respect.  As the
     Receiver notes, Lake is "a veteran loan modification operator."  DE64 at 12.  He

26   also has connections throughout the "field," including with Colleagues in Law and

27   the Barilla Law Firm.  *See* TRO Mem. at 13 n.43.  Based on these facts and the
     evidence against Lake, there is a substantial risk that Lake will resume illegal loan

28   modification activities.

controls to repay his victims. Simply put, the facts and the law strongly support continuing the asset freeze. The fact that Pacios might have more "comparative culpability" is legally irrelevant.[23]

### B. Lake's Other Asset Freeze-Related Arguments Are Meritless.

#### 1. Allowing Lake to Incur Debt Will Injure Third Parties.

Lake also argues that the Court should narrow the asset freeze to allow Lake to incur unsecured debt, such as credit card debt or unsecured personal loans. Opp. at 10-12. As the Court is aware, however, the FTC has already agreed once (and would agree again) to allow Lake to receive unsecured personal loans to fund his defense or living expenses if there are appropriate assurances that the money Lake receives is from a properly-informed, independent third party. *See* DE57-58. However, the problem with credit card debt is that Lake currently has no ability to repay it, and the Court (in equity) has a duty to fashion relief that does not unduly burden third parties (such as Lake's credit card company). If Lake demonstrates that funds he would use to repay new unsecured debt come from assets that are not frozen (such as earnings from future employment), then the FTC would agree that Lake can incur unsecured debt to the extent of those new assets. Without such an additional constraint, however, the Court should not modify the asset freeze.

#### 2. Joint and Several Liability Is the Correct Standard.

Lake also argues that he is not jointly and severally liable. Opp. at 13-14. However, joint and several liability is the correct standard for three reasons. First, any MARS Rule violation is deemed to violate the FTC Act,[24] and courts have

---

[23] Lake cites no authority for the proposition that the Court should consider "comparative culpability" when determining whether to continue the asset freeze. This is unsurprising because what matters is whether Lake is liable, not whether other parties (such as the HOPE Defendants) are also liable for the same injuries.

[24] A violation of the MARS Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act. *See* 12 U.S.C. § 5538; 15 U.S.C. § 57a(d)(3).

1    authority to hold defendants jointly and severally liable under the FTC Act.  *See,*

2    *e.g.*, *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1271 (S.D. Fla. 2007)

3    (holding FTC Act violators "jointly and severally liable for the total amount of

4    consumer injury"); *FTC v. Sharp*, 782 F. Supp. 1445, 1453 (D. Nev. 1991) (same).

5    In fact, the only court to consider this issue in the context of an "assisting and

6    facilitating" claim held the defendant jointly and severally liable.  *See FTC v. HES*

7    *Merch. Servs.*, No. 6:12-CV-1618, 2015 WL 916349, at *1 (M.D. Fla. Feb. 11,

8    2015), *appeal docketed*, No. 11-11500 (11th Cir. Apr. 8, 2015).  Indeed, in a case

9    like this one—where Lake's conduct was integral to the theft's success—joint and

10   several liability is particularly appropriate.

11          Second, the "assisting and facilitating" provision is a regulatory analogue to

12   common law aiding and abetting—in fact, the claims have identical elements.[25]

13   Significantly, common law aiding and abetting allows for joint and several

14   liability.  *See* RESTATEMENT (SECOND) OF TORTS § 876 cmt. d ("If the

15   encouragement or assistance is a substantial factor in causing the resulting tort, the

16   one giving it is himself a tortfeasor and is responsible for the consequences of the

17   other's act.").[26]  It makes no sense to allow defendants to escape with less liability

18   because their deceitful act is a statutory or regulatory violation rather than a

19   common law wrong.  For this reason as well, joint and several liability is proper.

20

21   _____

22          [25] The MARS Rule's "assisting and facilitating" provision requires (1) an
     underlying violation, (2) knowledge (or conscious avoidance of knowledge) of the
23   violation, and (3) substantial assistance to the violator.  *See* 12 C.F.R. §1015.6.
     Similarly, the RESTATEMENT (SECOND) OF TORTS § 876 addresses "persons acting
24   in concert," and subsection (b) outlines aiding and abetting.  *See, e.g.*, *Witzman v.*
     *Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (identifying §
25   876(b) as stating the elements of aiding and abetting).  Exactly like the MARS
     Rule, Section 876(b) requires an underlying violation, knowledge, and that the
26   secondary tortfeasor "substantially assist or encourage the primary tortfeasor[.]"

27          [26] *See also Reilly v. Anderson*, 727 N.W.2d 102, 107-12 (Iowa 2007) (noting
     that the RESTATEMENT provides that secondary tortfeasors found to aid and abet are
28   jointly and severally liable).

Third, Lake concedes that "to avoid joint and several liability," he "has the burden of proving that the harm is capable of apportionment." Opp. at 14 (citing *Burlington Northern v. United States*, 556 U.S. 559, 614 (2009)). Lake fails to satisfy this burden and, indeed, he does not even suggest how the Court might apportion the harm.[27] For this reason as well, joint and several liability is proper.[28]

### 3.    Consumer Loss Is the Proper Redress Measure.

Finally, Lake argues that his liability should be capped at what he received ($800 per file). Opp. at 14. However, "equity requires the wrongdoer to restore the victim to the *status quo*." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) (quotation omitted). This remains true in situations, like this one, where "the loss suffered by the victim is greater than the unjust benefit received by the

---

[27] Lake's request, addressed below, that the Court cap his liability at the amount he received is not a suggested "apportionment" of the sort *Burlington Northern* and the RESTATEMENT intend. Both sources speak to apportionment based on the divisibility of contribution (for instance, one defendant might be 80% responsible for an accident, and another 20%), not the tortfeasors' relative gain from the wrong. *See Burlington Northern*, 556 U.S. at 614 (discussing RESTATEMENT § 433A and explaining that "apportionment is proper when "there is a reasonable basis for determining the contribution of each cause to a single harm"). Lake has not proposed an apportionment based on the Defendants' relative contribution (nor could he, *see supra* n.28), and therefore, he has not met his burden to avoid joint and several liability.

[28] Lake further concedes that "apportionment is inappropriate in cases where the harm is not capable of reasonable, logical, or practical division." Opp. at 14. (citing the commentary to RESTATEMENT § 433A). Here, the harm is impossible to apportion. Depending on when they realized the fraud, victims made between one and four payments over months. Although Lake's interaction with victims followed general patterns, his role with respect to each individual victim was unique. Thus, although Lake substantially assisted the entire fraud, exactly how he affected individual victims varied. It is also impossible to sever Lake's role from even the victim's first payment, because if he had disclosed the fraud immediately, in some cases, the victim might have recovered funds. Additionally, had Lake disclosed the fraud to enough victims, the entire scam might have collapsed more quickly, thereby preventing many victims from losing even their first payment. In short, any sort of simple apportionment is impossible.

defendant." *Id.* (citation omitted).[29]  Given the egregious nature of the wrongs this case involves and Lake's active, deliberate contribution to the theft, equity demands that consumer loss is the proper redress measure.[30]

## **CONCLUSION**

For all the aforementioned reasons, the FTC asks the Court to enter the proposed Preliminary Injunction against Lake.

Respectfully submitted,

Dated:  5/11/15

JONATHAN COHEN
DC Bar No. 483454; jcohen2@ftc.gov
MIRIAM R. LEDERER
DC Bar No. 983730; mlederer@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-9528
Washington, DC 20580
202-326-2551 (Cohen); -2975 (Lederer);
-3197 (facsimile)

---

[29] *See also FTC v. Stefanchik*, 559 F.3d 924, 931-32 (9th Cir. 2009) ("[B]ecause the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits. . . .  We conclude that the district court did not abuse its discretion by holding the defendants liable for the full amount of loss incurred by consumers.").

[30] Notably, Lake's frozen assets are a mere fraction of the amount he owes, however one measures it.  Put differently, determining how to measure Lake's redress liability is immaterial to the asset freeze because there is no theory pursuant to which Lake's frozen assets would exceed his liability.  Specifically, the FTC estimated 432 victims as of mid-February, and approximated 485 victims by mid-April, when the Temporary Receiver halted operations.  *See* TRO Mem. at 2 n.2.  Even ignoring *Figgie* and *Stefanchik*, and assuming incorrectly that Lake is only responsible for $800 per victim, that still amounts to $385,600.  The Receiver reports that approximately $16,000 of Lake's assets are frozen, *see* DE64 at 4, but he may have inadvertently omitted one account with approximately $44,000, for a total of around $60,000.  However, even considering other assets Lake may have, his total assets fall far short of even the most generous view of his potential liability.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHN D. JACOBS (Local Counsel)
CA Bar No. 134154, jjacobs@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
310-824-4343; -4380 (facsimile)

Attorneys for Plaintiff Federal Trade Commission

## CERTIFICATE OF SERVICE

I, Miriam Lederer, certify that I am over the age of 18 and am employed by the Federal Trade Commission.  My business address is 600 Pennsylvania Avenue, N.W., CC-9528, Washington, D.C. 20580.  On May11, 2015, I caused the following document to be served:  Plaintiff's Reply in Support of a Preliminary Injunction Against Defendant Denny Lake.  I served the following individuals:

Through the ECF System

Andrew W. Robinson and Daniel M. Benjamin
McNamara Benjamin LLP
501 West Broadway, Suite 2020
San Diego, CA 92101
(619) 269-0400

*Attorneys for Court-Appointed Receiver Thomas W. McNamara*

Thomas J. Borchard
Janelle M. Dease
Sabrina C. Narain
Borchard & Callahan, APC
25909 Pala, Suite 300
Mission Viejo, California 92691
(949) 457-9505

*Attorneys for Defendant Denny Lake*

*Pro Se Defendants and Pro Se Relief Defendant*
(via electronic mail with consent)

Brian Pacios
bpacios2012@yahoo.com

Chad Caldaronello
chadchomeloans@cox.net

Justin Moreira
justinmoreira07@yahoo.com

Derek Nelson
dnelson222@gmail.com

Cortney Gonsalves
autumnrosesmommy@yahoo.com
(Relief Defendant)

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Miriam Lederer
MIRIAM LEDERER
DC Bar No. 983730; mlederer@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-9528
Washington, DC 20580

Attorney for Plaintiff
FEDERAL TRADE COMMISSION

DATED:       May 11, 2015

Executed in Washington, D.C.